UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
ZAIRE PAIGE-BEY,

                    Plaintiff,

      - against -

OFFICER RASHAN LACOSTE and
OFFICER DAVID LAWRENCE,

                  Defendants.
--------------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**
13-CV-7300 (RRM) (RER)

       This is at least the third *pro se* civil rights action brought plaintiff Zaire Paige-Bey,

formerly known as Zaire Paige, ("Plaintiff" or "Paige-Bey"), against the City of New York, New

York City Police Department ("NYPD"), Officer Rashon LaCoste, other NYPD officers, and

others involved in the criminal justice system.[1]  This action – which arises from LaCoste's

August 16, 2008, arrest of Plaintiff – originally named seven defendants and several causes of

action, but all claims except the malicious prosecution claims against LaCoste and his partner,

David Lawrence, (collectively, "Defendants"), have been dismissed.  Defendants now move for

summary judgment with respect to the remaining claims, arguing that Plaintiff lacks evidence to

overcome the presumption of probable cause arising from Plaintiff's indictment on the charges

for which LaCoste arrested him.  For the reasons set forth below, that motion is granted in part

and denied in part.

## BACKGROUND

       The following facts are not in dispute.  On August 16, 2008, LaCoste arrested Plaintiff

and three other men – Richard Reid, Steven Curtis, and a minor, A.R. – in a rear bedroom on the

---

[1] Although some of Defendants' submissions refer to defendant LaCoste as "Lacoste," most refer to him as
"LaCoste."  Accordingly, this Court will assume that the latter is correct.

first floor of a two-family house located at 2052 Strauss Street in Brownsville, Brooklyn ("2052").  A quantity of crack cocaine, $988 in cash, several pistols, and other gun-related items were allegedly in plain view in the bedroom.  The police did not see Plaintiff in physical possession of any this contraband, aside from a gun which LaCoste alleges he saw Plaintiff drop.  However, under New York law, "[t]he presence of a narcotic drug … in open view in a room, other than a public place, under circumstances evincing an intent to unlawfully mix, compound, package or otherwise prepare for sale such controlled substance is presumptive evidence of knowing possession thereof by each and every person in close proximity to such controlled substance at the time such controlled substance was found …."  N.Y. Penal Law § 220.25(2).  In addition, constructive possession of contraband may be "established by showing that a defendant exercised dominion and control over the place where contraband was seized."  *People v. Manini*, 79 N.Y.2d 561, 572–73 (1992).

Shortly after the arrest, LaCoste prepared an arrest report relating to Plaintiff.  It alleged that, at around 3:00 p.m. on August 16, 2008, LaCoste observed Plaintiff smoking marijuana.  (Arrest Report (Doc. No. 72-2) at 1.)  When LaCoste approached him, Plaintiff ran into 2052.  (*Id.*)  LaCoste pursued him and, while inside the building, observed unspecified "defendants" – presumably, including Plaintiff – in possession of four firearms and crack cocaine.  (*Id.*)  The arrest report described only one of those firearms – a silver Bauer .25 caliber semiautomatic pistol, (*id.* at 2) – and did not state that LaCoste had observed Plaintiff in physical possession of any firearms.  According to the arrest report, Plaintiff did not live at 2052 but resided at 45 Riverdale Avenue, several blocks away.  (*Id.*)

On August 17, 2008, a paralegal employed by the Kings County District Attorney prepared a Criminal Court complaint relying on information obtained from LaCoste.  (Criminal

Court Complaint (Doc. No. 72-1).)  That complaint alleged that LaCoste saw Plaintiff drop a .25 caliber pistol containing five live rounds of ammunition on the floor of a bedroom located inside 2052.  (*Id.*)  It further alleged that the officer observed two other firearms – a 9-millimeter pistol containing 14 live rounds of ammunition and another 9-millimeter pistol containing 11 live rounds – lying on a bed and a quantity of crack cocaine sitting on a dresser in that room.  (*Id.*)

According to the Criminal Court complaint, LaCoste observed A.R. in the bedroom with Plaintiff.  (*Id.*)  Accordingly, the complaint accused Plaintiff of possessing the three guns and the controlled substance in concert with A.R.  (*Id.*)  The complaint did not allege that any other men were present in the bedroom, did not mention a fourth gun, and did not mention the $988.

Sometime in late 2008, Plaintiff and A.R. were jointly indicted for drug and gun possession.  (Indictment No. 10896/2008 (Doc. No. 72-5).)  The 16-count indictment charged both men with possessing four, not three, separate firearms on August 16, 2008.  (*Id.*)  Specifically, the indictment charged both men with four counts of criminal possession of a weapon in the second degree on the theory that they possessed the firearms with intent to use them unlawfully against another in violation of New York Penal Law §265.03(1)(B), and four counts of criminal possession of a weapon in the fourth degree on the theory that they knowingly possessed the firearms in violation of New York Penal Law §265.01(1).  The indictment also charged A.R. alone with four counts of criminal possession of a weapon in the second degree on the theory that he knowingly possessed a loaded firearm somewhere other than in his home or place of business in violation of New York Penal Law §265.03(3).

Plaintiff alleges, and Defendants do not deny, that he was acquitted on all charges.  (Plaintiff's Affidavit in Opposition to Motion to Dismiss (Doc. No. 26-1) at 1.)  This action ensued.

This Action

Plaintiff's original complaint, filed in December 2013, and amended complaint, filed in April 2014, both named the same seven defendants: LaCoste, Lawrence, the City of New York, its mayor and police commissioner, the Kings County District Attorney, and the Assistant District Attorney assigned to Plaintiff's case.  Both pleadings also listed six causes of action, including a malicious prosecution claim.  In May 2014, Corporation Counsel of the City of New York appeared on behalf of all defendants except Lawrence.  The following month, Corporation Counsel moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court granted that motion in large part, dismissing all claims except the malicious prosecution claims against defendants LaCoste and Lawrence.  (12/7/2016 Memorandum and Order (Doc. No. 32) at 17.)

After Plaintiff filed a second amended complaint, (Doc. No. 34), and Defendants answered that pleading, (Doc. No. 35), Defendants moved for summary judgment on the malicious prosecution claims, arguing that Plaintiff had failed to adduce sufficient evidence to support such claims.  Defendants argued 1) that Defendants did not initiate a criminal proceeding against Plaintiff, 2) that Plaintiff had not adduced sufficient evidence to overcome the presumption of probable cause arising from the indictment, 3) that Plaintiff adduced no evidence of malice, and 3) that Plaintiff could not establish a deprivation of liberty.  (*See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Doc. No. 61).)

In a Memorandum and Order dated March 29, 2019 (the "2019 M&O"), the Court denied that motion with leave to renew.  The Court held that due to Plaintiff's "inartful pleadings" and Defendants' "meager and inadequate briefing on the motion," the Court could not "conclusively address two key issues underlying the … claim of malicious prosecution: the initiation

requirement, and whether Paige-Bey has overcome the presumption of probable cause created by his indictment by the grand jury." (2019 M&O (Doc. No. 66) at 8–9.)  With respect to the latter issue, the Court held that Defendants' briefing was "inadequate with respect to whether Paige-Bey has overcome, through the affidavits of his relatives and other evidence, the presumption of probable cause created by his grand jury indictment." (*Id.*)  However, the 2019 M&O held that Plaintiff had established a post-arraignment deprivation of liberty, holding that Plaintiff "was in fact required to appear at [post-arraignment] court proceedings relating to the prosecution in question." (*Id.* at 12.)

The 2019 M&O acknowledged that Plaintiff was required to meet the "competing testimony plus" standard established in *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003), in order to overcome the presumption of probable cause arising from Plaintiff's indictment.  However, the Court noted that Plaintiff's own affidavit alluded to "trial evidence" that might provide the "plus factor." (2019 M&O at 11.)  That affidavit suggested that there was evidence that "a gun that was supposed to have been loaded with a magazine could not possibly have been loaded, [that] suspicious substances were found in the recovered narcotics [, that] … neither Paige-Bey's DNA nor his fingerprints were found on the gun Paige-Bey was purportedly holding in his hand immediately before the gun was recovered [, and that although] … an exclusionary DNA sample was requested from Officer LaCoste, … he refused to provide one." (*Id.* (internal citations omitted).)  The Court noted that Defendants' first motion for summary judgment did "not even address this evidence, or discuss how it fit[ ] in to the 'competing testimony plus' standard." (*Id.*)

Although Defendants timely filed a second motion for summary judgment, the Rule 56.1 Statement included in that submission pertained to entirely different case.  Accordingly, the

Court denied that motion on procedural grounds.  (3/31/2020 Memorandum & Order (Doc. No. 77) at 3.)  However, noting that the failure to provide a proper Rule 56.1 Statement appeared "inadvertent," the Court granted Defendants leave to renew the motion yet again.  (*Id.* at 2.)

<u>The Instant Motion</u>

On May 28, 2020, Defendants served Plaintiff with the instant motion:  their third motion for summary judgment.  According to Defendants' counsel's Declaration of Service, Plaintiff was served with five documents: a Notice of Motion, a Rule 56. 1 Statement, a Notice Pursuant to Local Civil Rule 56.2, a Declaration of Assistant Corporation Counsel Joseph Gutmann and annexed exhibits, and a Memorandum of Law in Support of Defendants' Motion for Summary Judgment.  (Declaration of Senior Counsel Omar J. Siddiqi (Doc. No. 81).)  Since the Rule 56.1 Statement was the only one of the five documents subsequently filed on the Court's Electronic Case Filing System, the Court assumes that the other four documents were substantively identical to those filed in support of the second motion for summary judgment: *i.e.*, Docs. No. 69 and 71–73.

Defendants' Memorandum of Law in Support of their Renewed Motion for Summary Judgment ("Defendants' Memo") (Doc. No. 73), focuses entirely on the question of whether Plaintiff's evidence is sufficient to overcome the presumption of probable cause created by his indictment.  It specifically urges the Court to "disregard" the affidavits of Plaintiff's mother, Stephanie Ayeni, and sister, Zane Pauling – both of which contradicted LaCoste's claim that Plaintiff was found in the bedroom with the contraband – characterizing them as "lacking in credibility" and "contradicting plaintiff's own sworn testimony" at trial.  (*Id.* at 7.)  Defendants also note that these relatives' claim that officers forcibly brought Plaintiff from the second floor to the first-floor bedroom is contradicted by a statement A.R. made to the police, in which he

stated that he and Plaintiff decided to go downstairs after hearing a commotion on the first floor. (*Id.*)  However, the only legal authorities Defendants cite for the proposition that the Court can disregard this testimony are *Hale v. Mann*, 219 F.3d 61 (2d Cir. 2000), and *Mack v. United States*, 814 F.2d 120 (2d Cir.1987), both of which stand for the proposition that "a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."  *Hale*, 219 F.3d at 74 (quoting *Mack*, 814 F.2d at 124).

Defendants' Memo points out that Plaintiff has not provided transcripts or other proof to substantiate the existence of trial testimony showing that the magazine for the gun which Plaintiff was allegedly holding did not fit.  (Defendants' Memo at 6–7.)  It also argues that the absence of DNA and fingerprint evidence and LaCoste's refusal to supply a sample of his own DNA do not affirmatively support Plaintiff's version of events.  (*Id.* at 8–9.)  Defendants assert that it is possible that no DNA evidence or fingerprints could be recovered, and "possible that defendant LaCoste was mistaken in his belief that it was plaintiff who was in possession of the gun in question, but that there remained probable cause to arrest plaintiff based upon the guns, ammunition, and drugs in the room in which plaintiff was present."  (*Id.* at 9.)  Defendants do not argue that LaCoste was never asked for a DNA sample, only that he had "no duty" to do so.  (*Id.* at 9.)

Plaintiff's Response

Plaintiff has responded to Defendants' submissions with an unsworn affidavit, which attaches 16 exhibits.  This affidavit (hereafter, "Plaintiff's Affidavit") contains arguments and exhibits responsive to points raised in Defendants' Memo.  But it also contains several exhibits suggesting that LaCoste misled the Grand Jury.

First, Plaintiff's Affidavit attaches statements of three persons who claim to be witnesses to the events of August 16, 2008.  Two of the statements are in the form of nearly identical sworn affidavits signed by Plaintiff's mother, Stephanie Ayeni, and sister, Zane Pauling. (Plaintiff's Aff. (Doc. No. 82), Ex. A.)  The third is a signed statement made to LaCoste by Plaintiff's co-defendant, A.R.

Those statements are not entirely consistent.  Plaintiff's mother and sister both claim that they saw LaCoste drag Plaintiff down a staircase and into a room where other men were already handcuffed.  In contrast, A.R. told LaCoste that he and Plaintiff ran downstairs when the heard a commotion, and were told by police to come into a room where they were handcuffing two other men, (*id.*, Ex. B.)  However, the three statements are consistent in that they all attest to the fact that Plaintiff was in 2052 to get or visit his infant daughter and was upstairs at the time that LaCoste entered the downstairs bedroom.  Although Plaintiff himself urges the Court to disregard A.R.'s statement since it is unsworn and might be a product of coercion, he argues that the Court should not determine Ayeni's and Pauling's credibility but should leave that decision to the jury.  (*Id.* at 2.)

Second, Plaintiff's Affidavit attaches an Evidence Collection Team Report completed by a Police Officer Hector Deleon.  (*Id.*, Ex. E.)  According to Deleon's report, he went to the 73rd Precinct on the evening of August 16, 2008, to process the two firearms LaCoste allegedly found on the bed.  (*Id.*, Ex. E.)  Both firearms were checked for fingerprints "with white powder yielding negative results."  (*Id.*)  However, three swabs of skin-cell DNA were recovered from each firearm and sent to the Office of the Chief Medical Examiner for DNA analysis.  (*Id.*) According to Deleon, LaCoste refused to provide a "buccal elimination swab."  (*Id.*)  Plaintiff

has not introduced evidence of the results of the DNA analysis, but persuasively argues that the prosecution would have have introduced any DNA evidence that incriminated him.  (*Id.* at 5.)

LaCoste's Grand Jury Testimony and Other Evidence Submitted by Plaintiff

Among the exhibits attached to Plaintiff's Affidavit is a transcript of testimony LaCoste gave on October 29, 2008.  (*Id.*, Ex. M.)  Although nothing in the transcript indicates that this testimony was made before the Grand Jury, the Court notes that only prosecutors were present at the time LaCoste testified and that Plaintiff alleges that his case was presented to the Grand Jury on October 29, 2008.  (*Id.* at 8.)  The Court concludes that this is a transcript of LaCoste's Grand Jury testimony, which Plaintiff's counsel would have received prior to LaCoste's testimony at trial. *See People v. Rosario*, 9 N.Y.2d 286 (1961).

That testimony gives an account of the incident that is inconsistent with the account set forth in the arrest report.  According to LaCoste's Grand Jury testimony, he was walking down Strauss Street in plain clothes at 3:00 p.m. on August 16, 2008, and saw a man sitting on the steps of 2052.  (*Id.*, Ex. M., at 5.)  When LaCoste said, "Police, don't move," the man ran in the front door of the two-family home and straight into a back room.  (*Id.*, Ex. M., at 6.)  The officer then gave chase and tackled the man as he entered the room.  (*Id.*, Ex. M., at 7.)  LaCoste never told the Grand Jury the name the man he chased, but he later testified that the man was Richard Reid, not Plaintiff.  (*Id.*, Ex. O, at 1033.)

LaCoste told the Grand Jury that, after tackling the man, he looked up to see two individuals.  (*Id.*, Ex. M., at 7.)  One, later identified as Plaintiff, had a firearm in his hand, but dropped it on the floor "once he saw" the officer.  (*Id.*, Ex. M., at 7.)  Immediately thereafter, LaCoste saw a second man, later identified as A.R., who was sitting on a bed, throw a firearm towards a shoe box located roughly two feet from LaCoste.  (*Id.*, Ex. M., at 7.)

According to LaCoste, the room contained a quantity of contraband – almost all of which happened to be in plain view.  There was a 9-millimeter Ruger loaded with 14 rounds, a silver Taurus loaded with 11 rounds, a black magazine for an AK-47, and a gun cleaning kit on the bed.  (*Id.*, Ex. M., at 9.)  There was a "white-powdery-rocky substance" on the dresser.  (*Id.*, Ex. M., at 9.)  The $988 was on top of a television set.  (*Id.*, Ex. M., at 11.)

During his testimony, LaCoste was asked if any of the individuals he had placed under arrest at the scene made statements.  (*Id.*, Ex. M., at 11.)  LaCoste mentioned only two statements.  First, he claimed that Plaintiff told the man whom LaCoste had chased into the house that "he was about to eat everything that was found there in his house" – a statement which LaCoste interpreted as meaning that "[h]e was going to take the rap for everything in the house."  (*Id.*, Ex. M., at 11–12.)  Second, LaCoste claimed that Plaintiff told him "the reason he had the firearms was because he thought they were getting robbed."  (*Id.*, Ex. M., at 12.)

Neither of these statements were included in the Notice pursuant to New York Criminal Procedure Law §710.30(1)(a), which is included in Exhibit B to Plaintiff's Affidavit.  However, that document discloses that both Richard Reid and Plaintiff made statements to LaCoste on August 16, 2008, about which the Grand Jury was not informed.  First, at approximately 3:25 p.m., while still at 2052, Richard Reid said, in sum and substance, "That's my money.  Can I get my money?"  (*Id.*, Ex. B.)  Two minutes later, Plaintiff told LaCoste, in sum and substance, that he did not live at 2052.  (*Id.*, Ex. B.)

 LaCoste not only did not mention these statements to the Grand Jury, but implied that the room containing the contraband was Plaintiff's bedroom.  The prosecutor asked: "In the bedroom, were there any photographs or any way of determining who resided there?"  (*Id.*, Ex.

M., at 12.)  LaCoste testified that there were photographs of Plaintiff "with his family."  (*Id.*, Ex. M., at 12.)

Plaintiff does not deny that there were photographs of him on the bedroom walls.  Rather, Plaintiff's Affidavit attaches a photograph which, he argues, shows there were "many, many, many photos" on the walls.  (*Id.* at 7, Ex. I.)  Plaintiff's Affidavit asserts that 2052 was owned by the family of his child's mother, who testified at his trial that her male cousins lived in the room.  (*Id.* at 5.)  According to Plaintiff, the photos also depict his co-defendants – the three men who were arrested with him.  (*Id.* at 7.)

Plaintiff's Affidavit attaches post-arrest paperwork suggesting that the police themselves believed that Plaintiff lived three blocks away and that at least one of his co-defendants lived at 2052.  In addition to LaCoste's arrest report, discussed above, a Property Clerk's Invoice prepared the date of the arrest, (*id.*, Ex. J.); a Complaint Follow-up form dated August 16, 2008, (*id.*, Ex. N); a Complaint Follow-up form dated August 22, 2008, (*id.*, Ex. K); a Complaint Follow-up form dated January 15, 2009, (*id.*, Ex. K); and an arrest warrant issued January 13, 2009, (*id.*, Ex. P), all listed Plaintiff's address as 45 Riverdale Avenue, Brooklyn.  The Complaint Follow-up forms dated August 22, 2008, and January 15, 2009, both reported that Steven Curtis, one of the four men arrested with Plaintiff, lived at 2052.  (Id., Ex. K.)  However, the Complaint Follow-up form dated August 22, 2008, indicates that the prosecution declined to prosecute Curtis for reasons which are not disclosed, and LaCoste's Grand Jury testimony made no mention of him or the existence of a fourth man in the room.

Plaintiff's Affidavit claims that LaCoste's Grand Jury testimony was false in stating that Plaintiff 1) was in physical possession of a firearm, 2) was downstairs when the officers entered the bedroom, and 3) was residing in the bedroom.  (*Id.* at 9.)  It further alleges that LaCoste

11

provided this false information to prosecutors with the intention of having Plaintiff charged, indicted, and convicted on false charges. (*Id.* at 9.) Plaintiff asserts that the malice arises from the fact that Plaintiff filed complaints about the 73rd Precinct, where LaCoste worked, prior to August 16, 2008. (*Id.* at 7.) As proof of this malice, Plaintiff attaches a copy of a "mug shot" – allegedly taken on August 16, 2008 – which shows Plaintiff in front of a poster disparaging the Civil Complaint Review Board ("CCRB"). (*Id.* at 6 & Ex. G.)

Although almost all the evidence provided by Plaintiff relates solely to LaCoste, Plaintiff's Affidavit argues that Lawrence is also liable for malicious prosecution. (*Id.* at 10.) It alleges that Lawrence participated in bringing Plaintiff downstairs and failed to inform his supervisors of LaCoste's wrongdoing, including a threat LaCoste alleged made to Plaintiff in which he said that he would charge Plaintiff with possession of everything in the house unless Plaintiff told LaCoste what he "want[ed] to know." (*Id.* at 10–11.) Plaintiff's Affidavit also implies that Lawrence testified falsely at trial, (*id.* at 11), though it does not allege that Lawrence ever testified before the Grand Jury, prepared any paperwork related to the incident, or knew what actions LaCoste was taking in furtherance of the prosecution.

Defendants' Reply

In their Reply Memorandum of Law ("Defendants' Reply") (Doc. No. 85), Defendants principally argue that Plaintiff "has provided no evidence beyond conclusory allegations that the defendant officers fabricated evidence." However, the only evidence that Defendants' Reply specifically addresses are the Ayeni and Pauling affidavits. Defendants do not mention or address the admissibility of the other documents attached to Plaintiff's Affidavit.

Although Defendants' Memo addressed only the probable cause element, Defendants' Reply faults Plaintiff for failing to respond to issues raised in the April 6, 2018, memorandum of

law filed in support of Defendants' original motion for summary judgment.  Specifically, Defendants' Reply argues that Plaintiff failed to rebut 1) the argument that he has not adduced evidence from which malice can be inferred and 2) the argument that Plaintiff suffered no additional deprivation of liberty due to his arrest in this matter.  In addition, Defendants argue that although Plaintiff filed a Rule 56.1 Statement, that document fails to comply with the requirements of Local Rule 56.1 and that all statements contained in Defendants' Rule 56.1 statement should be accepted as true.[2]

## STANDARD OF REVIEW

Summary judgment is warranted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact."  *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (quoting *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013)).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009)  If the initial burden is met, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Id.*  If the nonmovant cannot "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[2] Although Plaintiff filed a handwritten sur-reply, (Doc. No. 86), that submission was not authorized by the Court and will be disregarded.

An affidavit or declaration submitted to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "A party opposing summary judgment normally does not show the existence of a genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (citing cases). However, since "it is ordinarily impossible to state all of the facts that show that an event never occurred," *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998), "a conclusory statement that an event has not occurred, from a party having personal knowledge, may be sufficient to forestall summary judgment." *S. Katzman Produce Inc.*, 999 F.3d at 878 (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138–40 (2d Cir. 2009)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citation omitted). "[I]n reviewing the evidence and considering what inferences may reasonably be drawn, the court 'may not make credibility determinations or weigh the evidence.'" *S. Katzman Produce Inc.*, 999 F.3d at 877 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Accordingly, "[t]he evidence of the non-movant is to be believed, … even though contrary inferences might reasonably be drawn[.]" *S. Katzman Produce Inc.*, 999 F.3d at 877 (internal quotation marks and citations omitted).

14

**DISCUSSION**

The only claims remaining in this civil right action allege malicious prosecution by NYPD Officers LaCoste and Lawrence.  "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment … and must establish the elements of a malicious prosecution claim under state law …."  *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (internal citations omitted).  "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'"  *Id.* at 161 (quoting *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997)).  In addition, a plaintiff "must show some post-arraignment deprivation of liberty that rises to the level of a constitutional violation."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) (citing *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 309 (1986)).

A. The Issues Raised in the Instant Motion

The only issue raised in the instant motion for summary judgment relates to the absence of probable cause.  The original motion for summary judgment in this case raised arguments relating to other elements:  1) that Defendants did not initiate a criminal proceeding against Plaintiff, 2) that Plaintiff adduced no evidence of malice, and 3) that Plaintiff could not establish a deprivation of liberty.  (*See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Doc. No. 61).)  However, the Court denied that motion with leave to renew, holding that it could not grant summary judgment in light of Defendants' "meager and inadequate briefing."  (2019 M&O at 8.)  Defendants subsequently filed a second motion for

summary judgment, but that motion addressed only the probable cause issue.  (*See* Memorandum of Law in Support of Defendants' Renewed Motion for Summary Judgment (Doc. No. 73).) Although Defendants were subsequently granted leave to file this, their third motion for summary judgment, Defendants did not file a new memorandum of law in support of the instant motion.

For reasons which are unclear, Plaintiff's Affidavit addresses the issue of whether he suffered a post-arraignment deprivation of liberty.  (Plaintiff's Affidavit at 12.)  The Court's 2019 M&O resolved that issue in Plaintiff's favor, holding that because he "was in fact required to appear at [post-arraignment] court proceedings relating to the prosecution in question," Plaintiff had suffered a Fourth Amendment deprivation of liberty.  (2019 M&O at 12 (citing *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013); *Evans v. City of New York*, No. 12-CV-5341 (MKB), 2015 WL 1345374, at *6 (E.D.N.Y. Mar. 25, 2015)).  Although Defendants' Reply addresses this argument, (Defendants' Reply at 7–9), the Court will not revisit this issue.

The Court will also not address Defendants' argument regarding Plaintiff's failure to prove malice, which is raised for the first time in Defendants' Reply Memo.  While the Court "has discretion to consider arguments made and evidence submitted for the first time in a reply brief," *Kingstown Cap. Mgmt., L.P. v. Vitek*, No. 20-3406, 2022 WL 3970920, at *1 (2d Cir. Sept. 1, 2022) (summary order) (citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005)), the Court declines to exercise that discretion in this case.  The 2019 M&O implicitly rejected this argument by failing to grant relief on Defendants' original motion for summary judgment – which expressly raised it – and Defendants did not renew the argument in their subsequent memorandum of law in support of summary judgment.

The Court must address one other argument raised in Defendants' Reply: the argument that Plaintiff "has failed to fully oppose [D]efendants' Rule 56.1 Statement," and that "all facts contained therein should be deemed admitted" pursuant to Rule 56.1(c).  This argument is without merit.  Plaintiff's Affidavit attaches a seven-paragraph 56.1 Statement, which controverts each of the seven paragraphs contained in Defendants' 56.1 Statement.  Although it may not respond to every allegation of material fact in Defendants' 56.1 Statement and may not cite to all the evidence in support of Plaintiff's allegations, Plaintiff's 56.1 Statement constitutes an excellent effort to comply with the Local Rule.  The Court declines to sanction the *pro se* Plaintiff for a less-than-perfect compliance with Local Rule 56.1.

## B. Probable Cause

As discussed above, the "absence of probable cause is an essential element of a claim for malicious prosecution."  *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (N.Y. 1983).  An indictment "gives rise to a presumption that probable cause exists," but "the presumption may be rebutted by evidence of various wrongful acts on the part of police."  *Id.*  However, the presumption "can only be overcome by evidence that the indictment 'was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith.'"  *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quoting *Green v. Montgomery*, 219 F.3d 52, 60 (2d Cir. 2000)).

Since "it is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment," *Savino v. City of New York*, 331 F.3d 63, 73 (2d Cir. 2003), the plaintiff is required to "establish what occurred in the grand jury, and … that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'"  *Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004) (quoting

*Colon*, 60 N.Y.2d at 82).  A plaintiff cannot satisfy the burden "with mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Savino*, 331 F.3d at 73 (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)).  "Where the plaintiff's only evidence to rebut the presumption of probable cause is her own version of events, courts find such evidence 'to be nothing more than mere conjecture and surmise ….'" *Merrill v. Copeland*, No. 19-CV-1240 (BKS)(ML), 2022 WL 3212075, at *16 (N.D.N.Y. Aug. 9, 2022) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010)).

Conversely, where "the Court is presented with more than just the plaintiff's version of events, a question of fact may exist as to the propriety of the grand jury indictment." *Brandon*, 705 F. Supp. 2d at 273.  What additional evidence is sufficient to meet this so-called "competing testimony plus" standard is difficult to quantify.  However, "[w]here evidence shows that a police officer, knowing that no crime has been committed, presses the prosecution of criminal charges 'solely in order to further [the officer's] own personal goals,' a claim of 'bad faith' survives summary judgment." *McClellan*, 439 F.3d at 146 (quoting *Marshall v. Sullivan*, 105 F.3d 47, 55 (2d Cir. 1996)).  Similarly, district courts have found the "competing testimony plus" standard to have been satisfied when an arresting officer's sworn statements give conflicting accounts of the events leading to the plaintiff's arrest.  *See Taylor v. City of New York*, No. 19-CV-6754 (KPF), 2022 WL 744037, at *15 (S.D.N.Y. Mar. 11, 2022) (denying summary judgment on malicious prosecution claim because a jury could conclude from arresting officer's "flatly contradictory recollections of the circumstances" of a plaintiff's arrest on narcotics charges that the arresting officer "lied about observing [the] narcotics exchange" allegedly involving the plaintiff); *Minott v. Duffy*, No. 11 Civ. 1217 (KPF), 2014 WL 1386583, at *17–19

(S.D.N.Y. Apr. 8, 2014) (denying summary judgment on malicious prosecution claim in light of contradictions between a statement attributed to the arresting officer in the criminal complaint and a search warrant affidavit.)

In this case, Plaintiff has not adduced evidence of fraud, perjury, suppression of evidence, or bad faith conduct on the part of defendant Lawrence.  Plaintiff's Affidavit largely relates to actions taken by his partner, defendant LaCoste – the officer who arrested Plaintiff and his co-defendants.  Plaintiff's 13-page affidavit devotes only about one page to describing Lawrence's actions, all of which were in furtherance of LaCoste's misconduct.  (Plaintiff's Affidavit at 10–11.)  The affidavit asserts that Lawrence aided LaCoste in bringing Plaintiff downstairs to the first-floor bedroom and in detaining him; "co-signed a false story from Defendant LaCoste" about Plaintiff being downstairs, knowing that it was false; heard LaCoste threaten to charge Plaintiff with possession of all the contraband allegedly found in the bedroom unless Plaintiff told LaCoste what he "want[ed] to know," but failed to inform his supervisors of LaCoste's wrongdoing; and testified at Plaintiff's trial.  (*Id.*)  However, none of the exhibits attached to Plaintiff's Affidavit substantiate these allegations.  Moreover, none of the allegations concern fraud, perjury, suppression of evidence, or bad faith conduct in connection with the indictment of Plaintiff.  Accordingly, the Court grants Defendants summary judgment with respect to the malicious prosecution claim against defendant Lawrence.

In contrast, there is considerable admissible evidence which, taken in the light most favorable to Plaintiff, could permit a jury to infer that Plaintiff's indictment "was the product of fraud, perjury, the suppression of evidence … or other … conduct undertaken in bad faith" by defendant LaCoste.  *See Bermudez*, 790 F.3d at 377.  First, LaCoste's own statements regarding the incident were inconsistent.  The Arrest Report stated that LaCoste observed Plaintiff smoking

19

marijuana outside 2052 and chased him into the house.  (Arrest Report at 1.)  There, he allegedly observed "defendants" – presumably, including Plaintiff – in possession of four firearms and crack cocaine.  (*Id.*)  Although the Arrest Report specifically mentioned a silver Bauer .25 caliber semiautomatic pistol, (*id.* at 2), it did not allege that Plaintiff physically possessed that weapon or dropped it on the floor.  The Arrest Report also stated that Plaintiff resided at 45 Riverdale Avenue, not 2052.  (*Id.*)

LaCoste's testimony before the Grand Jury set forth a materially different version of events.  LaCoste testified that it was someone other than Plaintiff whom he had chased into the building.  (Grand Jury Minutes at 6.)  He claimed he tackled the man at the entrance to a first-floor bedroom but nonetheless looked up in time to see Plaintiff drop the .25 caliber pistol.  (*Id.* at 7.)  Another man who was in the room at the time – later identified as A.R. – then tossed another gun towards a shoebox located two feet from LaCoste.  (*Id.*)  He then observed two other firearms, a gun cleaning kit, a gun magazine, ammunition, a quantity of crack cocaine, and $988 – all in plain view.  (*Id.* at 9–11.)

LaCoste also told the Grand Jury about inculpatory statements made by Plaintiff but omitted any mention of exculpatory statements.  The officer testified that Plaintiff tacitly admitted owning the firearms, explaining that he had them because he thought they were getting robbed.  (*Id.* at 12.)  But LaCoste never mentioned that Plaintiff denied living at 2052 and that Richard Reid – the man LaCoste allegedly chased – claimed ownership of the $988.  Rather, LaCoste implied that Plaintiff lived in the bedroom by testifying that photographs of Plaintiff and "his family" were on the walls.  (*Id.* at 12.)

Plaintiff has adduced evidence that contradicts material portions of LaCoste's Grand Jury testimony or suggests that LaCoste made misrepresentations to the Grand Jury.  First, Plaintiff

has provided two sworn affidavits from family members who claim that Plaintiff was not in the downstairs bedroom when the police arrived, but was dragged downstairs by LaCoste. (Plaintiff's Affidavit, Ex. B.)  Second, Plaintiff's Affidavit attaches a statement Plaintiff's co-defendant, A.R., made to LaCoste in which A.R. stated that he and Plaintiff voluntarily went downstairs after hearing a "commotion" and after the police had already arrived.  (*Id.*)  Although A.R.'s account is inconsistent with Plaintiff's relatives' claim that Plaintiff was taken downstairs, these three statements are consistent in that they contradict LaCoste's claim that Plaintiff was in the downstairs bedroom when the police arrived.

To be sure, there is a substantial basis for questioning the credibility of these three accounts.  Plaintiff's family members are obviously interested witnesses and their affidavits also allege that the police assaulted Plaintiff downstairs, an allegation which Plaintiff denied in his sworn testimony at trial.  In addition, A.R. is not only a co-defendant who, like Plaintiff, has an interest in denying any connection to the downstairs bedroom but, according to his statement to LaCoste, the godfather of Plaintiff's daughter.  However, the Court may not make credibility determinations regarding this evidence.  *See Reeves*, 530 U.S. at 150; *S. Katzman Produce Inc.*, 999 F.3d at 877.  Rather, the Court must construe the evidence in the light most favorable to Plaintiff and credit these accounts in deciding this motion.  *See S. Katzman Produce Inc.*, 999 F.3d at 877.

Second, the Court notes that LaCoste's testimony is itself implausible.  LaCoste testified that he and his partner ran into a house in Brownsville at considerable personal risk for the sole purpose of effecting a marijuana arrest.  There, the plainclothes officers burst into a bedroom occupied by two armed men who, through some miracle, not only did not shoot them but waited for LaCoste, who must initially have been preoccupied gaining control of the man he tackled, to

look at them before they discarded their weapons.  In addition, all sorts of contraband just happened to be in plain view.  As noted above, the Court cannot make credibility determinations.  However, a reasonable juror might conclude that LaCoste's account was suspicious.

This is especially true since there was no forensic evidence to connect Plaintiff to the pistols recovered from the bed and evidence that LaCoste refused to cooperate with the forensic investigators.  Plaintiff has adduced evidence that the Evidence Collection Team went to the 73rd Precinct on the evening of August 16, 2008, and processed the two weapons allegedly recovered from the bed.  (Plaintiff's Affidavit, Ex. E.)  The forensics team could not recover any fingerprints but recovered three swabs of skin-cell DNA, which were sent to the Office of the Chief Medical Examiner for processing.  (*Id.*)  The team asked LaCoste for a "buccal elimination swab," but he refused to provide one.  (*Id.*)  Defendants have not introduced any evidence that the DNA analysis linked Plaintiff to these firearms.

Third, Plaintiff has introduced the Notice Pursuant to CPL §710.30(1)(a) which the prosecution provided to his defense counsel prior to trial.  (Plaintiff's Aff., Ex. B.)  This document, which provided notice of statements made by Plaintiff or his co-defendants to law enforcement officers, did not mention Plaintiff's admission that he had the guns because he thought they were getting robbed.  Although it is possible that this statement was disclosed in other notices or on subsequent pages of the notice provided to defense counsel,  Defendants make no such claim.  If the prosecution elected not to give notice of this highly inculpatory statement – a tacit admission of Plaintiff's possession of the weapons – a reasonable juror could infer that the prosecution itself did not credit LaCoste's claim that Plaintiff made this statement.

In addition, the §710.30 notice discloses two exculpatory statements that LaCoste failed to mention to the Grand Jury when asked if the men he arrested on August 16, 2008, had made

22

any statements.  The notice states that Richard Reid told LaCoste that he owned the $988 found

in the room and that Plaintiff told LaCoste that he did not live at 2052.  (Plaintiff's Aff., Ex. B.)

Yet, LaCoste not only failed to mention these statements but implied that, because Plaintiff was

depicted in photographs displayed on the walls of the bedroom, he lived in that room.  (*Id.*, Ex.

M, at 12.)  The Grand Jury apparently believed that Plaintiff lived there, since they charged only

A.R. and not Plaintiff with possession of a weapon somewhere other than his home.

The police, however, apparently did not believe this.  Plaintiff's Affidavit attaches police

paperwork, including a Property Clerk's Invoice prepared the date of the arrest, (*id.*, Ex. J.); a

Complaint Follow-up form dated August 16, 2008, (*id.*, Ex. N); and a Complaint Follow-up form

dated August 22, 2008, (*id.*, Ex. K).  These documents, which pre-date LaCoste's appearance

before the Grand Jury, all list Plaintiff's address as 45 Riverdale Avenue.  The Complaint

Follow-up Report dated August 22, 2008, also lists the addresses of Plaintiff's three co-

defendants and indicates that one of them – Steven Curtis – lived at 2052.  However, the

prosecution declined to prosecute Curtis for reasons which Defendants have not explained.

Finally, Plaintiff's Affidavit suggests an explanation for why LaCoste may have misled

the Grand Jury.  That affidavit alludes to complaints Plaintiff lodged against the 73rd Precinct in

connection with an incident which occurred before August 16, 2008.  (*Id.* at 6–7.)  To be sure,

Plaintiff has not adduced any proof to support this allegation, aside from the fact that the police

chose to photograph him in front of a poster critical of the CCRB.  However, the Court takes

judicial notice of the fact that Plaintiff brought an action against LaCoste and the 73rd Precinct in

2010 which alleged, among other things, that Plaintiff filed a complaint with the NYPD's

Internal Affairs Bureau following a July 12, 2008, incident in which Plaintiff allegedly suffered a

hairline fracture to his wrist as a result of being handcuffed by LaCoste or other officers of the

73rd Precinct.  (Complaint in *Paige v. LaCoste*, 10-CV-3356, at 3–4.)  In addition, the fact that

LaCoste testified that the photographs in the bedroom depicted Plaintiff and "his family" suggest

that LaCoste had encountered Plaintiff and his family prior to August 16, 2008.

## CONCLUSION

The Court concludes that Plaintiff has adduced sufficient evidence with respect to

defendant LaCoste to permit a jury to find that he had overcome the presumption of probable

cause stemming from his indictment.  Accordingly, Defendants' motion for summary judgment

with respect to the malicious prosecution claim against LaCoste is denied.  Since Plaintiff has not

adduced any non-conclusory evidence of fraud, perjury, suppression of evidence, or bad faith

conduct on the part of defendant Lawrence, Defendants' motion for summary judgment with

respect to the malicious prosecution claim against Lawrence is granted.

This action is recommitted to Magistrate Judge Cho for all remaining pre-trial matters,

including settlement discussions if appropriate.  The Clerk of Court is respectfully directed to

mail a copy of this Memorandum and Order to Plaintiff at Shawangunk Correctional Facility,

P.O. Box 750, Wallkill, New York 12589-0750 – the prison in which he is currently incarcerated

– and to update the docket sheet to reflect this new address.

SO ORDERED.

Dated: Brooklyn, New York
        September 30, 2022

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge